1   Katherine Eskovitz (SBN 255105)
    ROCHE CYRULNIK FREEDMAN LLP
2   1158 26th Street, No. 175
    Santa Monica, CA 90403
    keskovitz@rcfllp.com
3   (646) 791-6883

4   Joseph M. Delich
    Kyle W. Roche
5   Richard R. Cipolla
    (*pro hac vice applications forthcoming*)
    ROCHE CYRULNIK FREEDMAN LLP
6   99 Park Avenue, 19th Floor
    New York, NY 10016

7   Sean Eskovitz (SBN 241877)
    ESKOVITZ LAW
8   1217 Wilshire Boulevard, No. 3683
    Santa Monica, CA 90402

9   Brant W. Bishop
    BRANT W. BISHOP, P.C.
10  (*pro hac vice application forthcoming*)
    2000 Pennsylvania Avenue, NW Suite 7000
11  Washington, DC 20006

12  *Counsel for Apothio LLC*

13                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF CALIFORNIA

14  APOTHIO, LLC,                              No.

15          Plaintiff,
                                               **COMPLAINT**
16          v.
                                               42 U.S.C. § 1983: FOURTH,
17  KERN COUNTY; KERN COUNTY                   FIFTH, AND FOURTEENTH
    SHERIFF'S OFFICE; CALIFORNIA               AMENDMENTS;
18  DEPARTMENT OF FISH AND WILDLIFE;
    DONNY YOUNGBLOOD; JOSHUA                   CALIFORNIA CONSTITUTION:
19  NICHOLSON; CHARLTON H. BONHAM;             ARTICLE I, §§ 7 and 13;
    JOHN DOES #1 THROUGH #10,
20  UNKNOWN AGENTS OF THE KERN                 CALIFORNIA CIVIL CODE
    COUNTY SHERIFF'S OFFICE; JOHN              §52.1; COMMON LAW TORT
21  DOES #11 THROUGH #20, UNKNOWN              CLAIMS
    AGENTS OF THE CALIFORNIA FISH
22  AND WILDLIFE DEPARTMENT,

23          Defendants.

1

# INTRODUCTION

1.      This case arises out of one the largest wholesale destructions of personal property by government entities in the history of the United States. In late October 2019, without providing any notice or opportunity to be heard, Defendants deliberately and wrongfully destroyed 500 acres of Apothio's legal property, estimated to be worth at least $1 billion. By this lawsuit, Apothio seeks justice for the violation of its civil and constitutional rights, and compensation for the enormous damage Defendants caused.

2.      Founded in 2014, Plaintiff Apothio LLC focuses on researching and commercializing hemp plants for use in foods, nutraceuticals, and (eventually) pharmaceuticals, including to treat Dravet syndrome and other life-threatening types of epilepsy. To further that goal, in addition to maintaining its own land and facilities to support research and development, since 2015, Apothio has entered into research agreements with multiple institutes of higher learning.

3.      Apothio is an established agricultural research institution (EARI) legally authorized to research and commercialize hemp under both federal and state law. *See* 7 U.S.C. § 5940(b); Cal. Food & Ag. Code § 81000 *et seq.*[1]

4.      Trent Jones founded Apothio and serves as its Managing Partner. Jones has spent his career, first as a chiropractor from 1988 to 2014, caring for over 20,000 patients. Having lost a daughter to an unusual medical condition, when Jones received a call from a mother seeking help for her son who was suffering from Dravet syndrome,

---

[1]   Hemp refers to the "plant Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 5940(a). It is expressly excluded from the Controlled Substances Act. *See id.*; § 12619, Agricultural Improvement Act of 2018, Public Law No. 115-334, 132 Stat 4490 ("2018 Farm Bill").

1    Jones turned full-time to helping patients, especially children, through advancing his

2    lifetime work in clinical, natural, and aquaponics research.

3         5.    Apothio's leading seed variety—the "Noah Strain'—is now named for

4    that boy, Noah, who was unable to leave his bed due to the intensity and frequency of his

5    seizures. After one month of using Apothio's CBD oil, Noah was able to visit Disney

6    World. The plants derived from the Noah Strain have continued to help improve the lives

7    of Noah and patients all over the world.

8         6.    Apothio established its operations in Kern County in 2018. From the

9    beginning, Apothio shared extensive information about its operations, its plants, and its

10   business plans with the Kern County Agricultural Commissioner, the Board of

11   Supervisors, and the Kern County Sheriff's Office. Apothio's proprietary plant varieties

12   are conspicuous, readily growing out in the open to heights of fifteen feet or more.

13        7.    In October 2019, Apothio anticipated ultimately harvesting and extracting

14   legal byproducts from approximately 17 million hemp plants cultivated on 500 acres for

15   research and commercial purposes in careful compliance with California and federal law.

16        8.    As an EARI, Apothio is expressly permitted to grow and possess plants

17   that contain more than 0.3% THC and is also exempt from certain testing requirements

18   applicable to other hemp growers.

19        9.    Before October 25, 2019, the Kern County Sheriff's Office (KCSO) did

20   not communicate any concerns to Apothio about its hemp research, cultivation, or

21   commercialization efforts.

22        10.   On October 24, 2019, however, KCSO Sergeant Joshua Nicholson applied

23   for a warrant to search the farms on which Apothio's plants were being grown. On

information and belief, Defendant Nicholson, with the approval of Defendant Sheriff Donny Youngblood, intentionally or recklessly included material misstatements and/or omissions in the affidavit and/or statement of probable cause submitted in support of the search warrant application, including by misstating and/or omitting material information about Apothio's EARI status and Apothio's regular communication with county officials regarding its research and commercialization efforts, and by including the results of ad hoc field testing that was not only improperly conducted and unscientific, but irrelevant given Apothio's EARI status.

11.     And, to make matters worse, beginning Friday, October 25, 2019, without providing Apothio with any notice or opportunity to be heard, the KCSO and California Department of Fish & Wildlife improperly destroyed all of Apothio's legal hemp plants. Disregarding direction from both Congress and the California legislature to permit hemp cultivation and commercialization, and to encourage its research and development, the KCSO and CDFW officials, in full tactical gear, ordered Apothio's contracted farmers to bulldoze and bury 500 acres of Apothio's legal hemp crops—a destruction of private property on a scale that appears to be virtually unprecedented in U.S. history.

12.     Defendants' unlawful actions thereby deprived Apothio of any reasonable opportunity to safeguard its enormously valuable property from such wholesale and wrongful destruction. The market value of the legal hemp and hemp derivatives that Defendants destroyed is believed to have been approximately $1 billion. In addition, the reckless and haphazard destruction of Apothio's crops demolished Apothio's carefully organized system for tracking the genetic and phenotypic properties of those plants, depriving Apothio of vital research and intellectual property.

13.     There is every reason to think that Defendants will repeat their unlawful practices with any subsequent Apothio crops.

14.     This lawsuit seeks:

(a) damages for Defendants' destruction of Plaintiff's property and their violation of Plaintiff's civil and constitutional rights;

(b) a declaratory judgment recognizing Plaintiff's EARI status under California law and the legality of Plaintiff's development of hemp varietals for research and commercial purposes; and

(c) an injunction against Defendants' further violations of Plaintiff's rights and precipitous destruction of Plaintiff's property.

## THE PARTIES

15.     Plaintiff Apothio, LLC is a limited liability corporation organized under the laws of the State of Colorado and headquartered in Indiana. It is registered with the California Secretary of State to conduct business in California.

16.     Defendant Kern County is now, and, at all times herein alleged, was, a public entity organized and existing under the laws of the State of California. The County is a citizen of the State of California and a resident of the Eastern District of California.

17.     Defendant Kern County Sheriff's Office is now, and at all times herein alleged was, an agency of Kern County. The Kern County Sheriff's Office is a citizen of the State of California and a resident of the Eastern District of California.

18.     Defendant California Department of Fish and Wildlife is now, and at all times herein alleged was, an agency of the State of California.

19.     Defendant Donny Youngblood is now, and, at all times herein alleged, was, the Sheriff, Coroner, and Public Administrator of Kern County. On information and belief, Sheriff Youngblood is a citizen of the State of California and a resident of the

Eastern District of California.

20.     Defendant Joshua Nicholson is now, and, at all times herein alleged, was, a Sergeant in the Kern County Sheriff's Office. Plaintiff is informed and believes, and, on that basis, alleges, that Sergeant Nicholson is a citizen of the State of California and a resident of the Eastern District of California.

21.     Defendant Charlton H. Bonham is the Director of the California Department of Fish and Wildlife. Plaintiff is informed and believes, and, on that basis, alleges, that Director Bonham is a citizen of the State of California.

22.     Defendants John Does #1 – #10 are unknown agents of the Kern County Sheriff's Office who participated, either directly or indirectly, in the preparation and/or execution of the search warrant and/or the destruction of Apothio's property.

23.     Defendants John Does #11 – #20 are unknown agents of California state agencies, including the California Department of Fish and Wildlife, who participated, either directly or indirectly, in the preparation and/or execution of the search warrant and/or the destruction of Apothio's property.

24.     Plaintiff intends to propound prompt discovery to learn the true identities of John Does #1 – #20.

**JURISDICTION AND VENUE**

25.     Plaintiff Apothio, LLC brings this action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983; the California Tort Claims Act, California Government Code § 820; the California Tom Bane Civil Rights Act, California Civil Code § 52.1; and common law.

26.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

27.     This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. §§ 1331 and 1343, and has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a).

28.     This Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4.

29.     Venue is proper in this District because the property that is the subject of the action is located in this District, because a substantial portion of the acts and omissions giving rise to this suit occurred in this District, and because at least one of the Defendants is a resident in this District and all of the Defendants are residents of the State of California. *See* 28 U.S.C. § 1391(b)(1), (b)(2).

30.     Apothio timely filed an administrative claim with Kern County, pursuant to California Government Code § 910, within six months of the actions giving rise to this suit. The administrative claim was submitted on November 1, 2019. The administrative claim was amended and resubmitted within six months of the actions giving rise to this suit, as permitted by the statute, on December 16, 2019. The claim was rejected on December 18, 2019. This suit is properly filed within six months of that rejection. *See* Cal. Gov't Code § 945.6.

31.     Apothio timely filed an administrative claim with the California Department of Fish and Wildlife, pursuant to California Government Code § 910, within six months of the actions giving rise to this suit. The administrative claim was submitted on December 18, 2019. The claim was not responded to within forty-five days of the submission of that claim. This suit is properly filed within six months of that implicit rejection. *See* Cal. Gov't Code § 945.6.

**FACTUAL ALLEGATIONS**

I.    **Relevant Background**

    A.   Hemp May Be Researched and Commercialized Legally Under Federal
         And California Law

    32.    California and federal law both permit the research and commercialization of hemp, notwithstanding prohibitions on marijuana. Hemp and marijuana are variants of the same plant, *Cannabis Sativa L*, but hemp contains no more than 0.3% tetrahydrocannabinol (THC) in the dried flowering tops, the seeds, the resin extracted from the plant, or in any compound produced therefrom. Cal. Health & Safety Code § 11018.5. In other words, if a *Cannabis Sativa L* plant contains less than a 0.3% THC, it is hemp. Further, the California Business and Professions Code expressly states that "'cannabis' does not mean 'industrial hemp' as defined by Section 11018.5 of the Health and Safety Code." Cal. Business and Professions Code § 26001(f).

    33.    That approach is consistent with federal law. The Controlled Substances Act states that the "term 'marijuana' does not include . . . hemp, as defined in section 1639o of title 7." 21 U.S.C. § 802. That statute further provides that the "term 'hemp' means the plant Cannabis sativa L. and any part of that plant . . . with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o.

    B.   California Law Exempts Established Agricultural Research Institutions
         From Many Regulations Applicable To Other Hemp Growers

    34.    In November 2016, California voters passed Proposition 64, which, among other things, encourages research into hemp cultivation and production. It does this by allowing institutions known as Established Agricultural Research Institutions (EARIs) more leeway than any other industrial hemp growers with respect to the *Cannabis Sativa*

*L* plant. *See* Cal. Health and Safety Code § 81000(c)(1) (defining an EARI as "A public or private institution or organization that maintains land or facilities for agricultural research.").

35.     EARIs are expressly permitted to grow and possess plants that contain more than 0.3% THC. California Health and Safety Code § 81006(d)(10) states that EARIs "shall be permitted to cultivate or possess industrial hemp with a laboratory test report that indicates a percentage content of THC that is greater than three-tenths of 1 percent if that cultivation or possession contributes to the development of types of industrial hemp that will comply with the three-tenths of 1 percent THC limit." In contrast, other industrial hemp growers are not given this latitude, but are instead required to destroy any plants that contain 1% THC after the first test showing that result, as well as any plants that contain more than 0.3% THC after two such tests. *See* Cal. Health and Safety Code § 81006(d)(8).

36.     EARIs are also exempt from certain testing requirements applicable to other hemp growers. Whereas other industrial hemp growers are required, "no more than 30 days before harvest," to "obtain a laboratory test report indicating the THC levels of a random sampling of the dried flowering tops of the industrial hemp grown," California Health and Safety Code § 81006(d), that provision does not apply to EARIs, and no other California law requires any such testing by EARIs.

37.     As federal law evolved to allow for the research and commercialization of hemp, California community colleges have partnered with hemp growers as EARIs for research and economic objectives, as those partnerships offer significant benefits to students, as well as financial benefits to the colleges and their communities. Cerro Coso

Community College and Imperial Valley College were among the first community colleges to partner with local growers, and Antelope Valley College partnered with the first industrial hemp grower in Los Angeles County.

### C. The Commercial Market For Hemp

38.     The hemp plant contains hundreds of chemicals, referred to as "cannabinoids." Other than THC, these cannabinoids are not psychoactive and do not produce a "high" in users. They include cannabidiol (CBD), cannabinol (CBN), cannabigerol (CBG), and tetrahydrocannabivarin (THCV), among many others. Some of these chemicals are called "micro-cannabinoids," a term referring to cannabinoids that appear in smaller concentrations than CBD and THC. There are hundreds of these chemicals. Aside from the various cannabinoids, the hemp plant also contains other useful and valuable components, including fats, oils, waxes, and terpenes.

39.     In recent years, the demand for non-THC cannabinoids has grown substantially. Much of this new interest has been focused on CBD specifically. CBD has been linked to a number of physiological benefits. For example, CBD has been approved by the Food and Drug Administration (FDA), in the form of the drug Epidiolex (an oral solution of CBD), for the treatment of certain forms of epilepsy. And research into the medicinal and dietary uses of cannabinoids more generally has blossomed in recent years.

40.     CBD is the primary active ingredient in a variety of oils, sprays, tinctures, and other products sold over-the-counter throughout the country. In recent years, an increased public awareness of potential benefits of these products has led to a surge in demand for CBD.

41.     Hemp is a hardy plant. It grows well in a variety of weather areas, especially in dry, arid climates like the one found in Kern County. But as a result of this

hardiness, hemp does not co-exist peacefully with other plants. It competes aggressively for resources and rapidly depletes nutrients in the soil in which it is planted.

42.     As a result, hemp cannot be casually planted alongside other crops without considering how hemp plants are harvested. Great care must be taken to ensure hemp seeds are entirely removed from the soil when planting new crops. If hemp seeds are allowed to remain in the soil when other crops are planted, the hemp will crowd out these other crops, and the other crops will struggle or die as a result.

43.     The relative concentration of cannabinoids in a mature hemp plant is the product of a variety of factors, including growing conditions and plant genetics. And, importantly, the levels of cannabinoids and other compounds in hemp plants can vary dramatically during the course of a plant's lifecycle. For example, younger undried hemp plants may contain relatively high levels of THC, but by the time the plants mature and are ready to be harvested, that THC has often been converted to other chemicals.

44.     Because of this variation in chemical makeup, researching and breeding hemp plants to reliably produce high levels of non-psychoactive chemicals, which have significant and legitimate market value, is itself a valuable economic activity. Indeed, federal and California law recognize the value of such hemp-related research activities.

45.     There is a vibrant market demand for each of these non-psychoactive chemicals, either as sold individually or as sold in various mixtures. There are brokers, wholesalers, extractors, and other buyers ready and willing to purchase the various byproducts of the hemp plant. At the time of the Apothio plants' destruction in late October 2019, demand in these markets had reached historically strong levels.

46.     Hemp producers who, like Apothio, had shouldered the risk of developing

crops in anticipation of the surging demand for CBD and micro-cannabinoids were well positioned to capitalize on the high prices for these products. In particular, producers like Apothio, with large quantities of hemp plants already in the ground and harvestable in 2019, were particularly well-positioned.

47.     At the same time, the risks and expenses that Apothio had incurred to develop its head start meant that Apothio's advantage relative to competitors depended on its ability to seize the opportunity presented by market conditions in 2019. The same favorable market conditions might not exist even a year later, after other producers had time to catch up with Apothio's capabilities. And, indeed, Apothio's ability to succeed and thrive as an ongoing business might depend on the 2019 market opportunity.

**II.     Apothio's Operations And Interactions With Officials Before The Destruction**

A.     Apothio's Extensive Hemp Research and EARI Status

48.     Apothio is an emerging vertically-integrated player in the development of hemp-based foods, nutraceuticals, and (eventually) pharmaceuticals. As a result, Apothio is focused on every segment of the hemp-based market, from seeds to retail. This include genetics (conducting research to develop plants that will produce certain chemicals in the desired amounts); agriculture and agronomy (growing the plants); harvesting (using innovative methods to remove the plants from the ground and to prepare them for processing); extraction (removing the valuable by-products from the raw plants); formulation (turning these by-products into usable goods); delivery devices (developing ways for people to ingest these products, including through sprays, oils, tinctures, foods, etc.); and distribution (getting these products into the hands of consumers)

49.     Apothio is an EARI under California law. *See* Cal. Health and Safety Code § 81000(c). As part of its operations as an EARI, over the past several years,

Apothio has "maintain[ed] land or facilities for agricultural research." Cal. Health and Safety Code § 81000(c)(1). The land and/or facilities Apothio has maintained for hemp research includes the following:

    (a) In 2014, Apothio maintained 100 acres of land near Lancaster, California for the purpose of researching hemp plants and developing strains that would be commercially viable and produce desirable cannabinoids in specific amounts.

    (b) Apothio currently maintains four acres of land in California City, California for the purpose of similar research.

    (c) Apothio has maintained a "genetics farm" on a small portion of a 160-acre property near Oildale, California to provide Apothio with the ability to research and develop varieties of hemp plants.

    (d) In a building in Arvin, California, Apothio maintains greenhouses and other facilities to allow research and commercialization of additional genetic strains of hemp plants.

    (e) Before Defendants' misconduct that is the subject of this lawsuit, Apothio maintained 500 acres of hemp plants in Kern County, California, to grow, research, and harvest hemp plants.

50.    Consistent with its status as an EARI, Apothio has devoted significant funds and resources to the types of research and development activities encouraged by California law. Apothio's investment in research and development helped support the creation of several strains of hemp that—when properly grown to maturity and harvested—are high in CBD and other valuable hemp derivatives, but low in THC.

51.    As a result of its substantial research into hemp plants and their commercialization, Apothio has acquired patents and significant intellectual property and developed more than 100 proprietary varietals of hemp plants. The patents detail various hemp growing techniques, such as through the use of aquaponics, that can be used to

promote natural plant mutations and thereby remove THC production from a cannabis plant. The varietals developed through these techniques may differ dramatically across a number of characteristics—including, for example, in the ratio of CBD to other cannabinoids contained within the plants.

52.    Growers of *Cannabis Sativa L.* have historically focused on maximizing the amount of a particular cannabinoid in the plant. For many years, illegal growers focused on cultivating plants that would produce high THC levels, to satisfy the demand for illegal psychoactive substances. This illegal market is not and has never been Plaintiff's objective. To the contrary, Plaintiff has focused on developing varietals of hemp that, when mature and dry, contain little or no detectable THC.

53.    Given the increased interest, demand for, and market price of CBD in recent years, many legal growers have emerged and focused on cultivating plants that produce high amounts of CBD. Rather than focusing narrowly on CBD, Plaintiff's hemp research and development efforts have focused on the pharmacodynamic, pharmacokinetic, and dietary possibilities of the full "entourage effect" of non-psychoactive cannabinoids and other compounds that different hemp varietals can produce in varying levels.

54.    For example, recent research has shown that if epileptic patients are given the combination of the non-psychoactive cannabinoids, fats, waxes, and terpenes contained in the hemp plant, they experience superior seizure prevention effects than do patients who are given only isolated CBD.[2]

---

[2]    *See* Pamplona FA, da Silva LR, & Coan AC, *Potential Clinical Benefits of CBD-Rich Cannabis Extracts Over Purified CBD in Treatment-Resistant Epilepsy:*

55.     Apothio has invested substantial amounts in research designed to leverage an entourage effect for specific clinical outcomes, such as treating Dravet syndrome and other catastrophic types of epilepsy.

56.     Apothio's research has therefore largely focused on breeding plants that will not simply maximize CBD levels, but instead will express the wide range of non-psychoactive chemicals (in particular micro-cannabinoids) that the hemp plant produces.

57.     This research has already generated significant results. Although most strains of hemp produce plants with a micro-cannabinoid content totaling from 1–4%, some of Apothio's plant varieties have micro-cannabinoid contents above 20%.

58.     Apothio's leading seed variety—the "Noah Strain"—is genetically predisposed to produce hemp below 0.3% Delta-9 THC. It is named for one of Apothio's first patients, a 13-year-old boy named Noah who suffers from Dravet syndrome. Noah was unable to leave his bed, much less his home, due to the intensity and frequency of his seizures. After one month of using Apothio's CBD oil, Noah was able to visit Disney World. That success inspired Apothio to name the strain after him, and the plants derived from it have continued to help improve the lives of Noah and many other patients.

59.     In addition to cultivating plants whose genetics produce a favorable profile of legal chemicals, Apothio has succeeded in making larger, more resilient plants than its competitors. Apothio's plants grow exceptionally well, and exceptionally quickly.

60.     The confluence of Apothio's innovative hemp varieties and Kern County's hemp-growing climate has produced striking results. Although the germination rate for

---

*Observational Data Meta-analysis*, Frontiers in Neurology (Sep. 12, 2018), https://doi.org/10.3389/fneur.2018.00759.

most hemp plants is approximately 80%—*i.e.*, approximately 80% of seeds that are planted will sprout up into hemp plants—the germination rate for Apothio's plants has been approximately 95%. Last year, the overwhelming majority of Apothio's hemp plants averaged between 15 and 18 feet at mature height. In comparison, competitors' hemp varieties in Kern County averaged 3 feet or less at mature height. Apothio's mature plant height and weight is quite unusual for hemp plants. That alone makes Apothio's genetic strains more valuable even apart from the unique chemical compositions that they exhibit.

61.     Consistent with its goal of researching and commercializing hemp (not illegal marijuana), Apothio routinely tests its plants for THC content. And all of its hemp varietals have been independently tested via laboratory-grade chromatographs and certified to contain below 0.3% THC when measured in the mature, dried flower of the plants.

62.     On the occasion when Apothio plants have demonstrated high THC levels at maturity, Apothio has destroyed them. But even plants that must be destroyed can have research value, especially if they contain high levels of *other* non-psychoactive cannabinoids, such as CBD and CBN. Even when a high-THC parent plant is destroyed, the seeds it produces can be used to perform additional research, with the goal of cultivating offspring plants that bear a familial resemblance in some ways (high CBD and CBN levels) but not in others (low THC levels). Indeed, the California EARI law contemplates using plants with higher THC levels in precisely this way.[3]

---

[3]   *See* Cal. Health and Safety Code § 81006(d)(8) (allowing EARIs to possess and cultivate plants with THC levels "greater than three-tenths of 1 percent if that cultivation

63.     Beyond its research into various hemp growing techniques, Apothio also has pending patents for various beneficial uses of hemp, such as using the crop to remove heavy metals, chemicals, and other contaminants from soil and water. And Apothio's successful cultivation of plants with low THC levels enables its current research into the clinical application of hemp-derived micro-cannabinoids in the treatment of diseases such as type 2 diabetes.

B.  Apothio's Research Partnerships

64.     Apothio's own research efforts are independently sufficient to qualify it as an EARI under California law. Nevertheless, in the interest of furthering the breadth and scope of its research, Apothio has partnered with academic research institutions to conduct joint research projects. These partnerships further exemplify and underscore Apothio's status as an EARI.

65.     For example, in September 2015, Apothio entered into an agreement with the RAND Corporation, which operates a degree-granting educational program for masters and doctoral students. Under the terms of that agreement, Apothio agreed to provide RAND with "microeconomic data on the cost of cultivating and processing domestic hemp products" as well as data "relating to consumption (dosages, delivery routes, etc), benefits, and side effects from high-CBD hemp product usage for pediatric epilepsy."

66.     In January 2018, Plaintiff entered into "Research and Internship Agreements" with two local institutions of higher education, the Kern Community

---

or possession contributes to the development of types of industrial hemp that will comply with the three-tenths of 1 percent THC limit").

College District (the "District") and the Cerro Coso Community College (the "College"), which were approved by the Board of Trustees for the Colleges on March 8, 2018.

67.    In light of the recent explosion of interest in the industrial and commercial applications of hemp, the numerous hemp growers located in Kern County, and the mission of the District and College to provide practical vocational training to their students, the District and College were particularly interested in a partnership with Apothio. Under the terms of their partnership agreement, Apothio agreed to "serve as an internship site offering facilities, resources, and supervision to students." Apothio also agreed to "provide data and information to the college faculty" in order to "support research efforts in the fields of agriculture, business, curriculum development, and job training."

68.    On February 14, 2019, the Board of Trustees of the Colleges also approved an Agricultural License Agreement between Apothio and Kern County Community College District (on behalf of Cerro Coso Community College).

69.    Apothio and Cerro Coso Community College agreed to create "the first National Industrial Hemp Research, Development, and Commercialization Center." This "national research hub" was created to perform "ongoing 'research, development and commercialization' of Industrial Hemp related white papers, designs, patents, and many other forms of Intellectual Property."

70.    Apothio and the College also planned to develop additional "public-private research affiliations" that would conduct research into "agronomy, block chain and artificial intelligence related to the standardization of natural plant medicines, clean water, water conservation, renewable and sustainable energy production, as well as the

collection of empirical data regarding . . . Anxiety, Autism, Diabetes, Epilepsy, Chronic Pain Patients, Insomnia, Neurodegenerative diseases and the many other diseases related to chronic inflammatory patterns." And Apothio and the College agreed to share any revenues generated by these various research partnerships.

### C. Hemp in Kern County

71.     Kern County's unique desert climate is well suited to growing hemp. In addition to providing favorable growing conditions for the plants themselves, the dry, arid weather of Kern County further reduces any residual amounts of THC in the hemp plants, making them all the more suited for legal cultivation and sale.

72.     Kern County was an early adopter of legal hemp production. Within a month of California's legalization of hemp production, Kern County was already issuing permits to various farmers and companies in order to allow them to grow hemp.

73.     As Kern County Agricultural Commissioner Glenn Fankhauser has stated publicly, as of September 2019, nearly half of all registered hemp farm acreage in California was located in Kern County.

74.     Beyond the commercial benefits to the county of welcoming this new industry, Kern County hoped to reap the ancillary benefit of reducing the production of marijuana. Growing hemp and marijuana crops in close proximity results in a cross-pollination that ruins both crops. By permitting a large number of hemp producers to plant within county limits, Kern County hoped to discourage and crowd out marijuana producers.

### D. Apothio Regularly Met with Kern County Officials to Discuss Its Plans

75.     Since it began operating in Kern County in 2018, Apothio has maintained close contact with Kern County officials, apprising them time and again of its research

and development activities as well as its plans to commercialize its hemp.

76.     In the fall of 2018, Apothio contracted with a local grower, Stenderup Farms, to plant and organically manage 141 acres of hemp using seeds created and owned by Apothio. Before planting any hemp in Kern County, Plaintiff met with and briefed the Agricultural Commissioner of Kern County, Glenn Fankhauser.

77.     Plaintiff presented written evidence about Apothio's EARI status to the Commissioner, and clearly stated its intention to research, develop, and commercialize hemp in accordance with the laws of California and the United States.

78.     On October 12, 2018, the Kern County Agriculture Commissioner's office issued 2018 Map-Permit Number 1500007, Stenderup AG Partners, Map Number 1288, which identified the location where Apothio was permitted to plant and cultivate its hemp field:



79.     Around this same time and before planting any hemp in Kern County, Apothio also met with and briefed other government officials, including Defendant Nicholson, the official in charge of drugs and narcotics in the Kern County Sheriff's Office; two Chief Deputies in the Sheriff's office; and the Kern County Planning

Director, Lorelei Oviatt. Apothio also met with other local officials, including the city managers, city attorney, and mayor of California City, California.

80.    During each of these meetings, Apothio reiterated its EARI status. Apothio provided chromatograph test results and plans for extraction and commercialization, including copies of its commercial contracts. At no point during any of those meetings did any county official disagree, contradict, or question Apothio's status as an EARI.

81.    The purpose of growing these hemp plants was to conduct further research on the genetics, chemical makeup, and possible economic potential of the hemp plants themselves, and to provide the plants to a joint-venture (which was subsequently abandoned when the partner was unable to perform) whose purpose was to extract legal cannabinoids from the hemp plants.

82.    At the time this crop was being grown, Apothio conducted contemporaneous chemical testing of the plants. These tests confirmed that the plants would have THC levels of less than 0.3% at maturity, and this indeed turned out to be the case when the plants were finally harvested. Apothio shared its internal testing binders with Kern County Agricultural Commissioner Glenn Fankhauser, which showed that Apothio's plants were overwhelmingly testing below 0.3% THC, and that Apothio was carefully tracking the few exceptions testing above that threshold so they could be destroyed if they were not compliant with the 0.3% limit at the time of harvest.

83.    At the end of 2018, Apothio met with Captain Mike Nicholas of the Kern County Fire Department to review plans for an ethanol extraction system that would be used to extract and commercialize Apothio's hemp crops.

84.     In January 2019, at the conclusion of this 2018 planting, the Secretary of the California Department of Food and Agriculture, Karen Ross, sent an email to Stenderup Farms. This email specifically acknowledged that Apothio and Stenderup had been conducting a "research project on hemp." Secretary Ross further stated that she was "intrigued" by the hemp research that Apothio and Stenderup had been conducting, and that she had mentioned this research to one of her friends, a former member of the California legislature. And Secretary Ross offered to introduce Apothio and Stenderup to "several state, national and international clients who are involved in hemp" in the hopes of creating "future business opportunities" related to hemp commercialization.

85.     In February 2019, Apothio contracted with several additional local farmers to plant and organically manage approximately 500 additional acres of hemp: Stenderup Ag Partners; Mike Cauzza Farms; Lehr Brothers, Inc.; Vandborg Farms; Petrissans Dairy; and H&H Farms.

86.     Apothio subsequently filed registration materials with Kern County for these hemp fields. In response, the Kern County Agricultural Commissioner issued several additional map permits, which identified the precise locations of the fields where Apothio's hemp would be planted. These map permits were "generated by the Kern County Agricultural Commissioner/Sealer" between the fall of 2018 and the spring of 2019.

87.     Specifically, a Kern County map permit was issued for each of the farmers with whom Apothio contracted to grow the hemp plants. In each of these permits, the County acknowledged and certified that Apothio was growing hemp. The permits (which are reproduced below) include "Permit Number 1500007," issued for the hemp growing on Stenderup AG Partners' farm; "Permit Number 1502996," issued for the hemp growing on Mike Cauzza Farms' farm; "Permit Number 1500027," issued for the hemp growing on Lehr Brothers, Inc.'s farm; "Permit Number 1500624," issued for hemp growing on Vanborg Farms' farm; "Permit Number 1505528," issued for hemp growing on Petrissans Dairy's farm; and "Permit Number 1502277," issued for hemp growing on H&H Farms' farm.

88.     In March 2019, to finally realize the economic fruits of its longtime investment in research and development, and to continue its research, Apothio planted approximately 17 million industrial hemp seeds on the 500 acres of land described in the permits above, and the farmers were paid a per-acre fee for their services and use of their

land.

89.     From March 2019 onward, these hemp plants were grown openly in the 500 acres of fields. They were all clearly marked with signs on every corner accurately describing the fields as containing "Industrial Hemp." The more than 17 million plants had an average, mature size of over 15 feet, and represented hundreds of millions of grams of marketable CBD, among numerous other valuable chemicals and hemp byproducts.

90.     In May 2019, Apothio met with Lorelai Oviatt, Kern County Director of Planning and Natural Resources, to discuss Apothio's extraction and commercialization plans. Oviatt informed Apothio that no meeting was necessary and there was no license needed for processing hemp.

91.     Apothio had planned and prepared to harvest the plants in 2019. Thereafter, Apothio planned to (a) remove and sell many of the valuable seeds from the plants (after retaining sufficient seeds to replant another crop); (b) extract the legal components of hemp—including CBD, CBN, other cannabinoids, fats, waxes, oils, terpenes, fibers, distillates, and other byproducts—by contracting with extractors with whom Apothio had made arrangements; and (c) sell the economically valuable extracts and byproducts.

92.     Throughout 2019, including while the 500 acres of plants were growing, Apothio remained in contact with the County to inform the County about its continued work. On May 5, 2019, for example, Jones sent research updates to the Agricultural Commissioner, updating him on the results of Apothio's genetic testing and research. During 2019, Apothio provided updates on testing that included test results of plants

currently above 0.3% THC.

93.   News coverage also publicized that Apothio was growing hemp in Kern County. For example, a local news article published on June 3, 2019 described that Apothio was growing industrial hemp, and explained the crop was legal hemp, not marijuana:[4]



Hemp grows more than 6 feet tall in this file photo of a field along South Edison Road in Arvin.

94.   The article described Apothio as having "partnered with a local college to conduct research while also contracting with local farmers to grow the product for processing in Bakersfield," and that it "expected to harvest 512 acres of hemp" that would have a "yield of 330,694 pounds of CBD and 33,694 pounds of microcannabinoids."

---

[4]   John Cox, *Relax. That's not actually weed growing near Arvin*, BAKERSFIELD.COM (June 3, 2019), https://www.bakersfield.com/news/business/relax-that-s-not-actually-weed-growing-near-arvin/article_6d613616-83cb-11e9-abfe-f797aa445111.html.

95.     On June 7, 2019, Apothio sent a letter to the Office of the Kern County Agricultural Commissioner concerning "Apothio Seed Production." In that letter, Apothio reiterated to the Commissioner that "[p]er California Law, Apothio is an Industrial Hemp Research, Development and Commercialization Institution"—in other words, an EARI—and underscored that, as a result, "all Apothio Industrial Hemp seeds are compliant with State and Federal Industrial Hemp Guidelines."

96.     Apothio's letter further explained that its leading seed variety—the "Noah Strain"—was genetically predisposed to produce cultivated hemp plants with a chemical makeup containing "below 0.3% Delta-9 THC." The County never disputed, contradicted, or questioned any of the statements made in this letter.

97.     In statements reported by a local newspaper on September 30, 2019, the Agricultural Commissioner, Glenn Fankhauser, acknowledged that Apothio was an EARI and that the previous permits he had issued to Apothio were "under the research exemption." The article further stated that Apothio was a "business[] registered as [a] research institution"—one that was "permitted to grow and possess hemp that's 'hot,' defined as having a THC concentration greater than 0.3 percent." Once again, the article was explicit that Apothio is an EARI that California law authorizes to possess hemp plants containing greater than 0.3% THC as part of the process of developing hemp varieties with lower THC levels.

98.     On October 20, 2019, just four days before the KCSO applied for the search warrant, Jones sent more research updates to the Agricultural Commissioner.

**III.   The Unlawful Destruction of Apothio's Hemp Crops**

A.   Execution of the Search Warrant

99.     At 8 A.M. on Friday, October 25, 2019, Jones was notified that law

enforcement had entered one of the hemp fields operated by Mike Cauzza Farms.

100.     When Jones arrived at the field, he encountered two of the Defendants: Sergeant Joshua Nicholson from the Kern County Sheriff's Office and an unknown officer from the California Department of Fish and Wildlife. The encounter occurred on Sunset Road near Arvin, California.

101.     The two Defendants interviewed Jones. This interview was tape-recorded by Defendant Nicholson and the unknown CDFW officer, but Plaintiff does not have a copy of the recording. County counsel has refused to provide Apothio with any documents or recordings relating to the search warrant.

102.     During this interview, the two Defendants produced a search warrant, a redacted copy of which is attached as Exhibit A.

103.     The warrant was defective and inaccurate in numerous ways. Among other things, it identified "Trent JONES" as the "person[] described" to be searched. The warrant then described Jones as having "blue eyes" and "blonde hair." Apothio's CEO Trent Jones does not have blue eyes or blonde hair.

104.     The warrant also included a social security number for the subject "Trent JONES," but that number does not match the social security number for Apothio's CEO Trent Jones.

105.     The warrant sought authorization to search 459 acres for cannabis but only described 447.91 acres of parcels to be searched, conceding that "some of the hemp/cannabis fields do not fill the entire parcel."

106.     Nicholson did not provide Jones with a copy of the "Statement of Probable Cause" that was supposed to be "attached and incorporated" into the warrant itself. To

1   this day, Apothio has never seen that document and County Counsel has refused to

2   provide it to Apothio.

3       107.    On information and belief, any Statement of Probable Cause attached and

4   incorporated into the warrant did not accurately provide material information, including:

5   (1) the many communications Plaintiff had with Kern County and the Kern County's

6   Sheriff Office about its hemp production; (2) Apothio's status as an EARI under

7   California law; or (3) the aforementioned exemptions under California law for EARIs

8   like Apothio, including, in particular, the exemption EARIs have from testing

9   requirements and from the requirement to destroy plants with THC levels in excess of

10   certain thresholds. On information and belief, Defendant Nicholson, with the approval of

11   Defendant Youngblood, intentionally or recklessly misstated and/or omitted this

12   information. Upon information and belief, the search warrant was procured through

13   material misstatements and/or omissions in the Statement of Probable Cause.

14       108.    The warrant purported to permit the destruction of illegal "marijuana"

15   pursuant to the terms of California Health and Safety Code § 11479. But Apothio was not

16   growing illegal marijuana; it was growing legal hemp, and it was expressly permitted by

17   California law to continue growing plants with THC levels greater than 0.3%. As an

18   EARI, Apothio had no statutory destruction requirements at all, and even non-EARI

19   industrial hemp growers are not required to commence destruction immediately after a

20   certified laboratory confirmation of excessive THC content.

21       109.    There was no possible justification for the destruction, much less without

22   any notice or certified laboratory confirmation that Apothio's hemp was actually

23   marijuana. And nothing authorized Defendants' wholesale destruction of the entirety of

Apothio's plants.

110.    On information and belief, the KCSO Defendants also did not comply with the procedures for destruction set forth by the warrant and California Health and Safety Code § 11479.[5]

111.    Throughout the encounter, the individual Defendants never demonstrated that it was not reasonably possible to preserve Apothio's plants in place. It would have been possible to do so. Indeed, Plaintiff begged them to secure the property while Plaintiff obtained a temporary restraining order so this could be resolved by the court.

112.    During the October 25, 2019 interview, Defendant Nicholson uttered a number of expletive-laced statements demonstrating that the Sheriff's Office was aware of, but simply disregarded, the fact that Apothio was an EARI.

113.    During this interview, Defendant Nicholson also acknowledged to Jones that at least two of the fields that were ultimately destroyed contained *only* plants with THC levels less than 0.3%. Nicholson nevertheless said that he intended to destroy *all* of Apothio's crops. Defendants then did just that.

114.    After the tape recorder was turned off, Nicholson also claimed that he was going to put the Agricultural Commissioner in jail.

115.    After these statements were made, and without ever demonstrating that the plants were marijuana or that it would have been impossible to preserve the plants in place, Defendant Nicholson and the John Doe Defendants ordered the complete and total

---

[5]    Among other things, Defendants were required to: (1) retain five representative cannabis plant samples; (2) take photographs and videos of the total amount of crop to be destroyed; and (3) have the chief of the law enforcement agency "demonstrate [that] it was not reasonably possible to preserve the suspected controlled substance in place, or to remove the suspected controlled substance to another location."

destruction of the fields—approximately 17 million plants.

116.    The destruction began almost immediately upon the arrival of the officials. For the most part, this was accomplished using bulldozers owned by Kern County. But in addition, in a rush to accomplish the destruction of Plaintiff's property before any judicial intervention could be secured, Defendant Nicholson and the John Doe Defendants also directed the local farmers to destroy the crops (which belonged to Apothio) that the farmers had been growing. Defendants oversaw the farmers in carrying out Defendants' direction.

117.    Below are photographs of the crop destruction as it was being carried out on Defendants' orders:





118.    As a result of Defendants' actions, Apothio was denied the opportunity to seek a temporary restraining order, a preliminary injunction, or any similar form of emergency equitable relief from any court that would have prevented the destruction of the plants. Even non-EARI hemp growers – who are not exempted from testing requirements and are required to destroy "hot" plants – are permitted 48 hours before beginning destruction after appropriate laboratory testing. Cal. Health and Safety Code § 81006(e)(8).

119.    Before Apothio could seek judicial intervention, Defendants had accomplished the rapid destruction of all 500 acres of Apothio's plants—a total of approximately 17 million plants, containing an estimated 150 million pounds of hemp biomass.

120.    The bulldozing of the plants also resulted in the internment of tens of billions of seeds into the ground, roughly 120 million seeds per acre. The KSCO's actions, in other words, produced a concentration of seeds on the land that was orders of magnitude higher than Apothio had ever or would ever cultivate. As detailed above, Apothio had been planting the plants under carefully controlled research conditions in order to be produce genetic strains of hemp that would produce a certain chemical

makeup with reasonable certainty. The KCSO's internment of tens of billions of seeds, especially in such enormously haphazard concentrations, not only deprived Apothio of its ownership of those seeds, but also disrupted Apothio's research efforts related to those plants.

121.    Since October 25, 2019, the date on which Defendants began destroying the plants, Apothio has been unable to monitor the potential germination, growth, and development of the millions of seeds interred in the 500 acres. Nor has it been able to protect the seeds, which are valuable intellectual property, from theft or misuse.

B.    The Illegal And Irrational Testing of Apothio's Hemp Crop

122.    Because Apothio, as one of many hemp producers in Kern County, frequently communicated with Defendants about its harvest, plans, and adherence to California's hemp laws, Defendants knew, or reasonably should have known, that there was no probable cause to suspect that Plaintiff was illegally growing marijuana for distribution or committing any other offense.

123.    Nevertheless, at some point in the fall of 2019, on information and belief, Defendants or their agents entered Apothio's farms without a warrant and proceeded to test approximately forty female plants. These tests were fatally flawed in numerous ways and could not reliably measure the levels of THC, much less provide probable cause for a warrant or justification for the wholesale destruction of hundreds of acres of legal hemp crops.

1.    *Apothio's EARI Status Exempts It From Testing Requirements And, Therefore, Any Field Tests Could Not Constitute Probable Cause For The Search Warrant*

124.    California Food and Agriculture Code § 81006 sets out the requirements for laboratory testing by industrial hemp growers, but those requirements do not apply

"when industrial hemp is grown by a registered established agricultural research institution and tested in accordance with an approved research plan."

125.     As an EARI that had registered with the Kern County Agriculture Commissioner, Apothio was exempt from any testing requirements under California law. Accordingly, any testing performed by Defendants would have been irrelevant, and could never have supported probable cause for the search warrant.

    2.     *Moreover, Defendants' Purported Ad Hoc Field Tests Cannot Even Be Reconciled With The Regulations For Testing Non-EARI Hemp Crops*

126.     As explained above, and as recognized by the testing provision of the California Industrial Hemp Law, the THC content of hemp plants varies dramatically over the course of the plant's lifecycle, initially spiking before decreasing until the plants are mature, dried, and ultimately harvested.

127.     Defendants tested plants before they were mature and dried, virtually guaranteeing that the results would overstate the amount of THC in the hemp that Apothio was cultivating.

    3.     *Any Ad Hoc Field Tests Were Unscientific and Incapable Of Supporting Probable Cause For The Search Warrant*

128.     On information and belief, Defendants tested the Apothio plants only using material from one location on the plant, rather than multiple locations. To ensure an accurate, representative sampling of an individual plant, material from multiple locations on the plant must be tested.

129.     On information and belief, Defendants only tested female plants, which generally have higher THC content than male plants, thereby further skewing the overall testing results.

130.     On information and belief, Defendants tested the plants in a manner and

with equipment that rendered the results unreliable. In particular, Defendants used a testing machine called the "Orange Photonic Light Lab HPLC," which is supposed to be used only for field testing. It is not a laboratory-grade chromatograph, as the manufacturer states on its own website. Its results are not admissible in court. It is notoriously prone to human error, especially if it is not calibrated before every testing, a process that requires substantial training to be performed correctly. Moreover, the presence in the testing sample of any hemp-seed oil—which Apothio's plants produce in significant quantities—would also render the results unreliable.

131.    Given these intricacies of testing hemp using the Orange Photonic Light Lab, the protocol for using that machine requires testers to photograph each sample while it is in the machine to ensure an accurate set-up. Defendants have never produced any such photographs to Apothio. On information and belief, these photographs were never taken.

132.    On information and belief, at least four tests performed by Defendants returned a result of "poor confidence" and could not be relied upon.

133.    On information and belief, Defendants Kern County, the Kern County Sheriff's Office, and the California Department of Fish and Wildlife authorized the use of these inadequate test equipment and procedures and failed to train the individual Defendants to properly use this equipment or to accurately test hemp crops.

134.    On information and belief, Defendants Kern County, the Kern County Sheriff's Office and the California Department of Fish and Wildlife failed to obtain certified laboratory test reports as required for non-EARI industrial hemp testing.

> ### 4. *The Unreliable Field Tests Were Based On A Statistically and Legally Insignificant Sample and Could Not Support Probable Cause For The Search Warrant*

135. Upon information and belief, Defendants did not test enough plants to obtain a statistically significant sample of the fields as a whole. Upon information and belief, they tested just 0.0003% of the plants growing on the 500 acres.

136. *First*, as USDA hemp testing guidelines make clear, separate testing and sampling should be conducted for each lot of hemp that contains different strains. In October 2019, the 500 acres would have had roughly twenty lots based on the different strains being grown.

137. *Second*, USDA testing guidelines provide a formula for the number of samples to take depending on confidence level, acreage, and expected proportion of hemp plants having THC content greater than the acceptable THC level. Note that this formula assumes that crops will always have some crops above the acceptable THC level. On information and belief, the tests conducted by Defendants would not have remotely satisfied this requirement.

138. *Third*, USDA testing guidelines require inspectors to walk along crop rows and sample randomly from multiple points within the field, not just along the border.

139. For all of these reasons, the test results were unreliable and could not have established that *any* of Plaintiff's plants were illegal marijuana rather than entirely legal hemp. The test results certainly could not have justified wholesale destruction of all 500 acres.

C. <u>Defendant Nicholson Attempts To Generate Probable Cause After-The-Fact</u>

140.    On November 4, 2019, after Apothio's hemp crops had already been destroyed, Defendant Nicholson contacted Jill Board, the President of Cerro Coso Community College.

141.    Before this point, Defendant Nicholson had never contacted Ms. Board to investigate the circumstances of the College's research partnership with Apothio. On information and belief, Defendant Nicholson contacted Ms. Board *after* executing the warrant because he realized that failing to do so earlier was a mistake.

142.    During Defendant Nicholson's phone call with Ms. Board, his clear focus was to attempt to discredit the research partnership between Apothio and the College. He repeatedly attempted to misinterpret Ms. Board to be saying that Apothio was not growing hemp for the benefit of its agreement with the College. After the call, Ms. Board sent an email to Defendant Nicholson that concluded:

> Therefore, if I did not believe that our agreement establishes them as a research institution, why would we be forging ahead expecting them to be able to assist in the financing and work in this area? Thank you for reading this, but when lives of others are at hand, I believe one being fully informed is very important.

143.    On information and belief, Defendant Nicholson was not fully informed when he applied for a search warrant on October 24, 2019 and had not conducted a sufficient investigation into Apothio's EARI status and various research partnerships. In fact, not only did he fail to conduct a sufficient investigation, he disregarded direct evidence of Apothio's innocence.

144.    On information and belief, the lack of investigation was evidenced, among other things, by Defendant Nicholson's phone call with Ms. Board on November 4, 2019.

145.    On information and belief, Defendant Nicholson's call with Ms. Board was for the purpose of retroactively generating probable cause for the ill-gotten search warrant that had already been executed, and possibly to attempt to corroborate material misstatements and/or omissions contained in Defendant Nicholson's warrant application.

### D.   The KCSO's Failure to Return The Search Warrant

146.    Since their improper search and destruction of Apothio's property, Defendants have continued to flout their legal obligations.

147.    Pursuant to California Penal Code § 1534, a search warrant shall be executed and returned within 10 days after the date of issuance. At this time, "if the warrant has been executed, the documents and records shall be open to the public as a judicial record."

148.    California Health and Safety Code § 11479 also required the KCSO Defendants to file an affidavit, within 30 days, to set out their justification for destroying Apothio's plants.

149.    The KCSO Defendants have failed to timely file the search warrant return required by California Penal Code § 1534 or the affidavit required by California Health and Safety Code § 11479.

150.    After numerous communications with Kern County Superior Court staff, on February 24, 2020, Apothio's counsel notified the Kern County Sheriff's Office of its failure to return the required warrant. Counsel was informed that the Kern County Sheriff's Office required a court order to provide the warrant return, affidavit, and any other warrant materials.

151.    On March 10, 2020, Plaintiff filed a writ of mandate in Kern County Superior Court, seeking an order to command the Kern County Sherriff's Office to return

the warrant materials, and a motion for judicial notice that those materials are not under seal.

152.    After those filings, Apothio's counsel learned that the Kern County Sheriff's Office had returned certain warrant materials to the Kern County Superior Court shortly after Apothio's counsel had inquired about those materials from the KCSO. But even though the entirety of the warrant materials are now required to be publicly available under California law, the Kern County Sheriff's Office refuses to provide such warrant materials to Apothio.

153.    Accordingly, Apothio still has not received the search warrant materials, including any affidavit, statement of probable cause, or any other documents related to the search warrant.

154.    Defendants' failure to comply with its legal requirements has prejudiced Apothio's ability to vindicate its rights.

**IV.    The KCSO's Disregard Of Its Legal Obligations and Apothio's Rights Is Emblematic Of A Broader Pattern And Practice Of Abuses**

155.    In 2015, the prominent *Guardian* newspaper published a five-part series detailing repeated abuses by the Kern County Sheriff's Office.[6] The report showcased the KCSO's repeated disregard of civil and constitutional rights.

156.    For example, in 2015, Kern County had the largest number of people killed by police per capita in the entire country. The report also indicated that KCSO deputies "have been caught rewarding colleagues for aggressive use of batons with a

---

[6]    Jon Swaine & Oliver Laughland, *The County: the story of America's deadliest police*, THE GUARDIAN (Dec. 1, 2015), https://www.theguardian.com/us-news/2015/dec/01/the-county-kern-county-deadliest-police-killings.

'baby seal' prize for the best clubbing" and have adorned their patrol cars with decals declaring "we'll kick your ass."[7]

157.    The *Guardian* also reported that the Kern County Sheriff's Office takes steps to cover-up its misconduct. When deputies are accused of wrongdoing and caught on camera, they will confiscate the devices containing the incriminating video from the witness and intimidate the witness into silence.[8] Similarly, the office systematically underreports arrest-related deaths to federal and state authorities, exploiting the Sheriff's role as coroner to manipulate statistics regarding causes of death.[9]

158.    Rather than reflecting the isolated misconduct of a few bad apples, the Kern County Sheriff's Office's disregard of civil and constitutional rights starts from the top: A recently-released video of Sheriff Youngblood shows him arguing that it is cheaper for the KCSO to kill a suspect or inmate "because if we cripple them we get to take care of them for life."[10]

159.    It is therefore no surprise that the *Guardian* investigation's findings lent "weight to claims from critics that police in Kern County are effectively policed only by themselves."[11] One attorney who practices in Kern County stated on the record that Kern

---

[7]    Jon Swaine & Oliver Laughland, *The County:where deputies dole out rough justice*, THE GUARDIAN (Dec. 4, 2015), https://www.theguardian.com/us-news/2015/dec/04/the-county-kern-county-california-deputies-tactics.

[8]    *Id.*

[9]    *Id.*

[10]    *Kern County Sheriff caught on tape saying it costs less to kill suspects*, ABC7NEWS (April 13, 2018), https://abc7news.com/3337751/.

[11]    Jon Swaine & Oliver Laughland, *The County: partners in crime*, THE GUARDIAN (Dec. 10, 2015), https://www.theguardian.com/us-news/2015/dec/10/kern-county-california-police-killings-misconduct-district-attorney.

County law enforcement "will work to prevent you from getting any information whatsoever."[12] Indeed, there is evidence that the KCSO has repeatedly withheld evidence not only from defendants, but also from the district attorney's office and the courts.[13]

160.    In response to the *Guardian* reporting, the ACLU conducted its own investigation, which confirmed that the KCSO had engaged in "a practice of filing intimidating or retaliatory criminal charges against individuals" and that "[d]eficient oversight and accountability structures have allowed law enforcement misconduct to go unchecked."[14]

161.    The KCSO has already acted repeatedly in derogation of Apothio's rights. Apothio and its members, especially Trent Jones, are reasonably concerned about retaliation by the KCSO and the individual defendants in its employ for exercising Apothio's right to hold Defendants accountable for their misconduct.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983—Fourth Amendment**
**Unreasonable Search and Seizure/Destruction**
**(All Defendants)**

162.    Plaintiff fully incorporates the preceding paragraphs by reference herein.

---

[12]   *Id.*

[13]   Jason Kotowski, *Judge informs jury of more evidence KCSO failed to disclose in the Leslie Chance case*, KGET.COM (Jan. 10, 2020), https://www.kget.com/news/crime-watch/judge-informs-jury-of-more-evidence-kcso-failed-to-disclose-in-the-leslie-chance-case/; Adam Herbets, *Attorneys: KCSO Sergeant Suppressed Evidence For Years*, BAKERSFIELDNOW.COM (July 27, 2016), https://bakersfieldnow.com/news/local/attorneys-say-this-kcso-sergeant-concealed-evidence-for-years.

[14]   ACLU, PATTERNS & PRACTICES OF POLICE EXCESSIVE FORCE IN KERN COUNTY (Nov. 2017), https://www.aclusocal.org/sites/default/files/patterns_practices_police_excessive_force_kern_county_aclu-ca_paper.pdf.

163.   42 U.S.C. § 1983 states:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . . .

164.   All individual Defendants to this claim, at all relevant times, were acting under the color of state law in their capacity as officers of the Kern County Sheriff's Office, Kern County, and/or the California Department of Fish and Wildlife, and their acts or omissions were conducted in the scope of their employment.

165.   The Fourth Amendment of the United States Constitution guarantees the right to be free from unreasonable searches and seizures of persons, houses, papers, and effects.

166.   On information and belief, Defendants willfully and maliciously violated Plaintiff's right to be free from unreasonable searches and seizures under the Fourth Amendment by, among other things: (1) obtaining a search warrant through judicial deception by misstating and/or omitting material information regarding Apothio's communications with the Defendants and Apothio's status as an EARI; (2) entering the hemp fields without a valid warrant for the purpose of unlawfully harvesting Plaintiff's crops for purposes of testing them; (3) unlawfully testing Plaintiff's crops; (4) executing the search and causing the wholesale destruction of the 500 acres of hemp even though they knew or reasonably should have known there was no justification for those actions; and (5) failing to return the warrant materials in a timely manner.

167.   On information and belief, Defendants Kern County, the Kern County

Sheriff's Office, and the California Department of Fish and Wildlife (1) intentionally authorized or directed the individual Defendants to undertake the actions that violated Apothio's rights; (2) ratified the actions the individual Defendant's took to violate Apothio's rights; (3) failed to adequately train the individual Defendants; and (4) maintained an official policy and/or custom of deliberate indifference to violations of constitutional rights by KCSO officers.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983—Fourteenth Amendment
### Violations Of The Right To Due Process
### (All Defendants)

168.    Plaintiff fully incorporates the preceding paragraphs by reference herein.

169.    42 U.S.C. § 1983 states:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . . .

170.    All individual Defendants to this claim, at all relevant times, were acting under the color of state law in their capacity as officers of the Kern County, the Kern County Sheriff's Office, and/or the California Department of Fish and Wildlife, and their acts or omissions were conducted in the scope of their employment.

171.    The Fifth and Fourteenth Amendments of the United States Constitution guarantee freedom from deprivation of life, liberty, and property without due process of law, including a meaningful opportunity to be heard.

172.    Willfully and maliciously, Defendants violated Apothio's due process rights by (1) failing to comply with the testing procedures set forth in California Food

and Agriculture Code §§ 81000 *et seq.*; (2) failing to comply with the procedures contained in the warrant and codified in California Health and Safety Code § 11479; (3) failing to comply with Kern County Code of Ordinances (KCCO) §§ 8.54.050, 8.44.060, which set forth procedures for enforcing violation of the administrative codes and seeking an abatement order; (4) conducting unlawful, improper, and arbitrary and wholly unscientific testing of Plaintiff's crops without providing Plaintiff with an opportunity to respond to those tests; (5) destroying Plaintiff's entire hemp crop; and (6) failing to return the warrant materials in a timely manner.

173.   On information and belief, Kern County, the Kern County Sheriff's Office, and the California Department of Fish and Wildlife (1) intentionally authorized or directed the individual Defendants to undertake the actions that violated Plaintiff's rights; (2) ratified the actions the individual Defendant's took to violate Apothio's rights; (3) failed to adequately train the individual Defendants; and (4) maintained an official policy and/or custom of deliberate indifference to violations of constitutional rights by KCSO officers.

174.   On information and belief, the Kern County Sheriff's Office has an official policy and/or custom of regularly not returning warrant materials within the period required by law.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983—Fifth Amendment**
**Taking of Private Property Without Just Compensation**
**(All Defendants)**

175.   Plaintiff incorporates the preceding paragraphs by reference herein.

176.   42 U.S.C. § 1983 states:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District

of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

177.   All individual Defendants to this claim, at all relevant times, were acting under the color of state law in their capacity as officers of Kern County, the Kern County Sheriff's Office, and/or the California Department of Fish and Wildlife, and their acts or omissions were conducted in the scope of their employment.

178.   The Fifth Amendment of the United States Constitution prohibits the taking of private property for public use without just compensation.

179.   Plaintiff had a protectable property interest in its hemp crops which the Defendants intentionally destroyed, through the unlawful bulldozing of the hemp fields, or, in the alternative, through the decision of the Defendants to prohibit Plaintiff's hemp production;

180.   The Defendants never provided any compensation to Plaintiff for the destruction of this valuable property.

181.   On information and belief, that Kern County, the Kern County Sheriff's Office, and the California Department of Fish and Wildlife willfully and maliciously (1) intentionally authorized or directed the individual Defendants to undertake the actions that violated Plaintiff's rights; (2) ratified the actions the individual Defendant's took to violate Apothio's rights; (3) failed to adequately train the individual Defendants; and (4) maintained an official policy and/or custom of deliberate indifference to violations of constitutional rights by KCSO officers.

**FOURTH CAUSE OF ACTION**
**Cal. Civ. Code § 52.1—Fourth Amendment**
**Unreasonable Search and Seizure/Destruction**
**(All Defendants)**

182.    Plaintiff incorporates the preceding paragraphs by reference herein.

183.    The Fourth Amendment of the United States Constitution guarantees the right to be free from unreasonable searches and seizures of one's persons, houses, papers, and effects.

184.    The Tom Bane Civil Rights Act, California Civil Code § 52.1 states:

> Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured .
> . .

185.    On information and belief, Defendants willfully and maliciously violated Plaintiff's right to be free from unreasonable searches and seizures under the Fourth Amendment by, among other things: (1) obtaining a warrant through judicial deception by misstating and/or omitting material information regarding Apothio's communications with the Defendants and its status as an EARI; (2) entering the hemp fields without a valid warrant for the purpose of unlawfully harvesting Plaintiff's crops for purposes of testing them; (3) unlawfully testing Plaintiff's crops; (4) executing the search and wholesale destruction of the 500 acres of hemp even though they knew or reasonably should have known there was no justification for those actions; and (5) failing to return the warrant materials in a timely manner.

186.    Kern County, the Kern County Sheriff's Office, and the California

1   Department of Fish and Wildlife are vicariously liable for the wrongful acts of the

2   individual Defendants under § 815.2(a) of the California Government Code, which

3   provides that a public entity is liable for the injuries caused by its employees within the

4   scope of the employment if the employee's act would subject him or her to liability.

5       187.    On information and belief, Defendants Kern County, the Kern County

6   Sheriff's Office, and the California Department of Fish and Wildlife (1) intentionally

7   authorized or directed the individual Defendants to undertake the actions that violated

8   Apothio's rights; (2) ratified the actions the individual Defendant's took to violate

9   Apothio's rights; (3) failed to adequately train the individual Defendants; and (4)

10  maintain an official policy and/or custom of deliberate indifference to violations of

11  constitutional rights by KCSO officers.

12                    **FIFTH CAUSE OF ACTION**
                **Cal. Civ. Code § 52.1—California Constitution art. I § 13**
13                  **Unreasonable Search and Seizure/Destruction**
                              **(All Defendants)**
14
15      188.    Plaintiff incorporates the preceding paragraphs by reference herein.

16      189.    Article I, Section 13 of the California Constitution guarantees the right to

17  be free from unreasonable searches and seizures of one's persons, houses, papers, and

18  effects.

19      190.    The Tom Bane Civil Rights Act, California Civil Code § 52.1 states:

20          Any individual whose exercise or enjoyment of rights secured by
            the Constitution or laws of the United States, or of rights secured
            by the Constitution or laws of this state, has been interfered with,
21          or attempted to be interfered with [by threat, intimidation, or
            coercion, or attempts to interfere by threat, intimidation, or
22          coercion] may institute and prosecute in his or her own name and
            on his or her own behalf a civil action for damages, including, but
23          not limited to, damages under Section 52, injunctive relief, and
            other appropriate equitable relief to protect the peaceable exercise
            or enjoyment of the right or rights secured . . .

191.   On information and belief, Defendants willfully and maliciously violated Plaintiff's right to be free from unreasonable searches and seizures under the California Constitution by, among other things: (1) obtaining a warrant through judicial deception by misstating and/or omitting material information regarding Apothio's communications with the Defendants and its status as an EARI; (2) entering the hemp fields without a valid warrant for the purpose of unlawfully harvesting Plaintiff's crops for purposes of testing; (3) unlawfully testing Plaintiff's crops; (4) executing the search and wholesale destruction of the 500 acres of hemp even though they knew or reasonably should have known there was no justification for those actions; and (5) failing to return the warrant materials in a timely manner.

192.   Kern County, the Kern County Sheriff's Office, and the California Department of Fish and Wildlife are vicariously liable for the wrongful acts of the individual Defendants under § 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

193.   On information and belief, Defendants Kern County, the Kern County Sheriff's Office, and the California Department of Fish and Wildlife (1) intentionally authorized or directed the individual Defendants to undertake the actions that violated Apothio's rights; (2) ratified the actions the individual Defendant's took to violate Apothio's rights; (3) failed to adequately train the individual Defendants; and (4) maintain an official policy and/or custom of deliberate indifference to violations of constitutional rights by KCSO officers.

**SIXTH CAUSE OF ACTION**
**Cal. Civ. Code § 52.1—Fourteenth Amendment**
**Violations of the Right to Due Process**
**(All Defendants)**

194.    Plaintiff incorporates the preceding paragraphs by reference herein.

195.    The Fifth and Fourteenth Amendments of the United States Constitution guarantee freedom from deprivation of life, liberty, and property without due process of law, including a meaningful opportunity to be heard.

196.    The Tom Bane Civil Rights Act, California Civil Code § 52.1 provides that:

> Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with [by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion] may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured . . .

197.    The Defendants willfully and maliciously violated Apothio's due process rights by (1) failing to comply with the testing procedures set forth in California Food and Agriculture Code §§ 81000 *et seq.*; (2) failing to comply with the procedures set forth by the warrant and California Health and Safety Code § 11479; (3) failing to comply with Kern County Code of Ordinances (KCCO) §§ 8.54.050, 8.44.060, which set forth procedures for enforcing violation of the administrative codes and seeking an abatement order; (4) conducting unlawful, improper, and arbitrary testing of Plaintiff's crops without providing Plaintiff with an opportunity to respond to those tests; (5) destroying Plaintiff's entire hemp crop; and (6) failing to return the warrant materials in a timely

48

1    manner.

2        198.    Kern County, the Kern County Sheriff's Office, and the California

3    Department of Fish and Wildlife are also vicariously liable for the wrongful acts of the

4    individual Defendants under § 815.2(a) of the California Government Code, which

5    provides that a public entity is liable for the injuries caused by its employees within the

6    scope of the employment if the employee's act would subject him or her to liability.

7        199.    On information and belief, Defendants Kern County, the Kern County

8    Sheriff's Office, and the California Department of Fish and Wildlife (1) intentionally

9    authorized or directed the individual Defendants to undertake the actions that violated

10   Apothio's rights; (2) ratified the actions the individual Defendant's took to violate

11   Apothio's rights; (3) failed to adequately train the individual Defendants; and (4)

12   maintain an official policy and/or custom of deliberate indifference to violations of

13   constitutional rights by KCSO officers.

**SEVENTH CAUSE OF ACTION**
**Cal. Civ. Code § 52.1—California Constitution art. I § 17**
**Violations of the Right to Due Process**
**(All Defendants)**

        200.    Plaintiff incorporates the preceding paragraphs by reference herein.

        201.    Article I, Section 7 of the California Constitution guarantees freedom from

deprivation of life, liberty, and property without due process of law, including a

meaningful opportunity to be heard.

        202.    The Tom Bane Civil Rights Act, California Civil Code § 52.1 provides

that:

> Any individual whose exercise or enjoyment of rights
> secured by the Constitution or laws of the United States, or
> rights secured by the Constitution or laws of this state, has been
> interfered with, or attempted to be interfered with [by threat,

intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion] may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured . . .

203.   Defendants willfully and maliciously violated Apothio's due process rights by (1) failing to comply with the testing procedures set forth in California Food and Agriculture Code §§ 81000 *et seq.*; (2) failing to comply with the procedures contained in the warrant and codified in California Health and Safety Code § 11479; (3) failing to comply with Kern County Code of Ordinances (KCCO) §§ 8.54.050, 8.44.060, which set forth procedures for enforcing violation of the administrative codes and seeking an abatement order; (4) conducting unlawful, improper, and arbitrary testing of Plaintiff's crops without providing Plaintiff with an opportunity to respond to those tests; (5) destroying Plaintiff's entire hemp crop; and (6) failing to return the warrant materials in a timely manner.

204.   Kern County, the Kern County Sheriff's Office, and the California Department of Fish and Wildlife are vicariously liable for the wrongful acts of the individual Defendants under § 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

205.   On information and belief, Defendants Kern County, the Kern County Sheriff's Office, and the California Department of Fish and Wildlife (1) intentionally authorized or directed the individual Defendants to undertake the actions that violated Apothio's rights; (2) ratified the actions the individual Defendant's took to violate Apothio's rights; (3) failed to adequately train the individual Defendants; and (4)

maintain an official policy and/or custom of deliberate indifference to violations of constitutional rights by KCSO officers.

**EIGHTH CAUSE OF ACTION**
**California Torts Claims Act—Conversion**
**(All Defendants)**

206.    Plaintiff incorporates the preceding paragraphs by reference herein.

207.    Under the California Torts Claims Act, "a public employee is liable for injury caused by his act or omission to the same extent as a private person." Cal. Gov't Code § 820.

208.    Under the California Torts Claims Act, a public entity is vicariously liable for the torts committed by one of its employees within the scope of his or her employments. *See* Cal. Gov't Code § 815.2(a) ("A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.").

209.    Defendants wrongfully exercised control over Plaintiff's personal property.

210.    Plaintiff owned, possessed, and had a right to possess the hemp plants located on the 500 acres located in Kern County, California.

211.    Defendants willfully, maliciously, and substantially interfered with Plaintiff's property by taking possession of Plaintiff's personal property and destroying Plaintiff's hemp plants.

212.    Plaintiff did not consent to Defendants' actions.

213.    Defendants conspired with one another to take the actions giving rise to this claim.

214.   Plaintiff was harmed by Defendants' actions.

215.   Defendants' conduct was a substantial factor in causing Plaintiff's harm.

**NINTH CAUSE OF ACTION**
**California Torts Claims Act—Trespass to Chattels**
**(All Defendants)**

216.   Plaintiff incorporates the preceding paragraphs by reference herein.

217.   Under the California Torts Claims Act, "a public employee is liable for injury caused by his act or omission to the same extent as a private person." Cal. Gov't Code § 820.

218.   Under the California Torts Claims Act, a public entity is vicariously liable for the torts committed by one of its employees within the scope of his or her employments. *See* Cal. Gov't Code § 815.2(a) ("A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.").

219.   Plaintiff owned, possessed, and had a right to possess the hemp plants grown on the 500 acres in Kern County.

220.   Defendants willfully and maliciously interfered with Plaintiff's use and possession of Plaintiff's property, namely the hemp plants growing on the 500 acres in Kern County, and damaged that property. This damage included, but is not limited to, Defendants' actions in seizing and)\ testing Plaintiff's plants without a warrant and Defendants' actions on October 25, 2019, when they seized and bulldozed Plaintiff's property.

221.   Plaintiff did not provide consent for Defendants to trespass on this property.

222.    Further, Defendants exceeded any limited permissible scope to interfere with Plaintiff's property when they destroyed all of the approximately 17 million of the hemp plants growing on the 500 acres in Kern County.

223.    Defendants conspired with one another to take the actions giving rise to this claim.

224.    Plaintiff's property has been actually and proximately damaged as a result of Defendants' trespass.

**TENTH CAUSE OF ACTION**
**California Torts Claims Act—Negligence**
**(All Defendants)**

225.    Plaintiff incorporates the preceding paragraphs by reference herein.

226.    Under the California Torts Claims Act, "a public employee is liable for injury caused by his act or omission to the same extent as a private person." Cal. Gov't Code § 820.

227.    Under the California Torts Claims Act, a public entity is vicariously liable for the torts committed by one of its employees within the scope of his or her employments. *See* Cal. Gov't Code § 815.2(a) ("A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.").

228.    Plaintiff was harmed by Defendants' negligence and Defendants should be held responsible for that harm.

229.    Defendants negligently entered, inspected, tested, seized, and destroyed Plaintiff's property.

230.    Defendants were negligent in these actions, including, but not limited to,

1  being negligent *per se* by violating California Food and Agriculture Code §§ 81000-

2  81011, California Code of Regulations tit. 3, §§ 4920-4946, and California Code of

3  Regulations tit. 3, § 4950.

4      231.   Defendants conspired with one another to take the actions giving rise to

5  this claim.

6      232.   Plaintiff was harmed by these actions.

7      233.   Defendants' negligence was a substantial factor in causing Plaintiff's

8  harm.

9                    **ELEVENTH CAUSE OF ACTION**
                    **28 U.SC. § 2201(a)—Declaratory Judgment**
10                            **(All Defendants)**

11      234.   Plaintiff also seeks a declaratory judgment recognizing its EARI status and

12  the legality of its development of hemp varietals for research and commercial purposes

13  and its right to be free from arbitrary testing, seizure and destruction by law enforcement.

14      235.   An actual controversy has arisen, and now exists between Plaintiff and

15  Defendants, concerning their respective rights as they pertain to Plaintiff's EARI status

16  and its operations in Kern County.

17                            **DAMAGES**

18      236.   Defendants' conduct has caused Apothio substantial damages. While the

19  specific amount will be proven at trial, Apothio's damages are currently believed to

20  exceed $1 billion.

21      237.   But for Defendants' misconduct, Plaintiff would have commercialized the

22  approximately 17 million plants in the 500 acres that Defendants destroyed. As illustrated

23  below, this would have led to multiple streams of revenue from the marketable products

produced by the hemp plants. All of that revenue was lost entirely as a result of

Defendants' wrongful conduct.

238.   *First*, the plants would have yielded millions of grams of CBD.

239.   *Second,* the plants would have yielded millions of grams of hemp-derived fats and waxes.

240.   *Third*, the plants would have yielded millions of grams of hemp-derived terpenes.

241.   *Fourth*, the plants would have yielded millions of grams of micro-cannabinoids (for example, CBN).

242.   *Fifth,* the plants would have yielded millions of pounds of hemp fibers.

243.   *Sixth*, the plants would have produced hundreds of millions of seeds. The seeds themselves have intrinsic value for their germination ability, *i.e.*, their ability to produce more hemp plants.

244.   *Seventh*, the plants would have yielded approximately 1 million pounds of seed protein.

245.   *Eighth*, the plants would have yielded thousands of gallons of hemp-seed oil.

246.   Furthermore, Apothio, as a first-mover in the market, was poised to take advantage of rising prices by selling its product in part to fund future beneficial research. The destruction of Apothio's crops harmed Apothio's future profits due to the impairment of its first-mover advantage in the marketplace.

247.   In addition, and wholly apart from the lost revenue streams from Apothio's commercialization of its hemp, Defendants' misconduct also directly caused the loss of millions of hemp seeds. These seeds have independent value in the

marketplace, and their loss has severely compromised Apothio's ability to plant additional hemp crops in the future.

248.    Defendants' misconduct also destroyed significant intellectual property owned by Apothio. Apothio had developed specific genetic strains of hemp, grown under carefully monitored conditions, to lead to plants with certain chemical characteristics that could be reproduced in the future. As a result of Defendants' misconduct, that progress was wiped out.

249.    Defendants' actions caused critical damage to Apothio's ongoing research in that Apothio can no longer identify, organize, and carefully track the genetic and phenotypical characteristics of the millions of hemp plants that were indiscriminately bulldozed and will now germinate outside of Apothio's controlled conditions.

250.    Defendants' misconduct has also caused Apothio to experience a loss of confidence among some of its important commercial relationships, causing it to suffer negative economic consequences as a result. For example, Defendants' actions have damaged Apothio's current and future business partnerships with farmers in the community. Defendants' unlawful conduct has caused significant financial hardship, not only to Apothio, but to the farmers whom Defendants forced to plow millions of hemp seeds into their fields.

251.    Interring Apothio's intellectual property in the farmland has also subjected Apothio to a heightened risk that its intellectual property will be stolen or misused. Due to fear of Defendants' repeating their misconduct Apothio cannot presently cultivate the fields to extract its seedlings.

**EQUITABLE RELIEF**

252.    As detailed above, Defendants' misconduct caused the internment of

millions of Apothios's hemp seeds. These seeds, which are Apothio's property, have germinated and grown into a new generation of crop since Defendants bulldozed Apothio's last generation of plants.

253.   Meanwhile, in their communications with Apothio as well as their public statements, Defendants have stated that Apothio's plants are marijuana rather than hemp. As a result, Apothio has a credible fear that Defendants will again attempt to destroy all of Apothio's plants, thereby causing it additional damages.

254.   This additional testing and destruction will violate the laws of the State of California and of the United States, including, without limitation, Article I, Sections 7 and 14 of the California Constitution; the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; and the common law of the State of California.

255.   To prevent this, Plaintiff seeks a permanent injunction forbidding Defendants from testing, interfering with, tampering with, or destroying Apothio's hemp plants.

## PRAYER FOR RELIEF

256.   Wherefore Apothio requests relief as follows, and according to proof, against each Defendant:

    A.  general and compensatory damages in an amount according to proof;

    B.  special damages in an amount according to proof;

    C.  exemplary and punitive damages against each Defendant in an amount according to proof;

    D.  costs of suit, including attorneys' fees, under 42 U.S.C. § 1988, California Code of Civil Procedure § 1021.5, and any other applicable provision of law;

E.  a permanent injunction forbidding Defendants from testing, interfering with, tampering with, or destroying Apothio's hemp plants; and

F.  such other relief as may be warranted or as is just and proper.

**JURY DEMAND**

257.   Apothio demands trial by jury of all issues that can be so tried.


Respectfully submitted this 10th day of April, 2020,

*/s/ Katherine Eskovitz*
ROCHE CYRULNIK
  FREEDMAN LLP
Katherine Eskovitz
1158 26th Street, No. 175
Santa Monica, CA 90403
keskovitz@rcfllp.com
(646) 791-6883

Joseph M. Delich (*pro hac vice forthcoming*)
Kyle W. Roche (*pro hac vice forthcoming*)
Richard R. Cipolla (*pro hac vice forthcoming*)
99 Park Avenue, 19th Floor
New York, NY 10016
kyle@rcfllp.com
jdelich@rcfllp.com
rcipolla@rcfllp.com

ESKOVITZ LAW
Sean Eskovitz
1217 Wilshire Boulevard, No. 3683
Santa Monica, CA 90402
seane@eskovitz.com

BRANT W. BISHOP, P.C.
Brant W. Bishop (*pro hac vice forthcoming*)
2000 Pennsylvania Avenue, NW
Suite 7000
Washington, DC 20006
brant@bishop.us

*Counsel for Apothio LLC*